**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| SHARON K. TREMAINE (deceased) by next friend ROBERT E. TREMAINE, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:16-cv-01268-TWP-DML ) |
| NANCY A. BERRYHILL,[1] Acting Commissioner of the Social Security Administration, | ) ) ) |
| Defendant. | ) ) |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Sharon K. Tremaine ("Tremaine"), who is deceased, by next of friend Robert E. Tremaine, her husband, requests judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). For the following reasons, the Court **REMANDS** the decision of the Commissioner for further consideration.

### I.   BACKGROUND

**A.   Procedural History**

On August 23, 2012, Tremaine filed an application for SSI, alleging a disability onset date of January 1, 2005, due to her bipolar disorder with psychotic features, depression, scoliosis, and arthritis in her back. The claim was initially denied on November 1, 2012, and again on reconsideration on January 2, 2013. She filed a written request for a hearing on February 25, 2013.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Commissioner Carolyn W. Colvin as the defendant in this suit.

Tremaine died on December 1, 2013.[2] On December 20, 2013, Robert Tremaine ("Robert") filed a notice of substitution of party in light of Tremaine's death ([Filing No. 22-4 at 23](#)).

On July 10, 2014, a hearing was held before Administrative Law Judge Ronald T. Jordan (the "ALJ"). Robert was present and represented by counsel. Tremaine's sister, Peggy Lybrook, also was present at the hearing. Robert and Peggy Lybrook each testified during the hearing. George E. Parsons, an impartial vocational expert, also testified at the hearing. On August 6, 2014, the ALJ denied Tremaine's application for SSI. Following this decision, Robert requested review by the Appeals Council on October 3, 2014. On December 7, 2015, the Appeals Council denied Robert's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. On May 23, 2016, Robert, on behalf of Tremaine, filed this action for judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

**B.** **Factual Background**

At the time of her alleged disability onset date, Tremaine was thirty-four years old. She completed her high school education and took some classes after high school graduation. Prior to the onset of her alleged disability, Tremaine had an employment history of working on an assembly line, and as a teller, a waitress, and a "crew member". She also attempted to do data entry work through a temporary employment agency in 2008, but this work lasted only one day.

There is evidence throughout the record that indicates Tremaine suffered from physical impairments of scoliosis, arthritis of the back, insomnia, fatigue, pelvic muscle dysfunction, extensive diffuse hepatocelluar disease, obesity, urinary incontinence, gastroesophageal reflux disorder, and hypothyroidism. There also is evidence in the record that Tremaine sought various

---

[2] Tremaine's official cause of death was severe sepsis with septic shock, perforated colon with peritonitis, and pseudomembranous colitis due to clostridium difficile ([Filing No. 22-5 at 24](#)).

treatments for these impairments. However, the parties focus their arguments on Tremaine's mental health impairments, so the Court will focus this background section on her mental health impairments.

Tremaine suffered from bipolar disorder since at least 2006 ([Filing No. 22-2 at 39](#)). She was taking various anti-psychotic prescription medications, including Depakote and Risperidone, to treat her mental health impairments ([Filing No. 22-12 at 34](#)). Tremaine's evidence indicates that she sought and received treatment as early as 2008 for her depression and bipolar disorder from the St. Vincent Stress Center. *Id.* at 32–34.

In 2011, Tremaine reported that she had difficulty sleeping at night, suffered a loss of energy and a loss of interest in regular activities, and also lost any desire to complete daily tasks or participate in activities she once enjoyed. During an August 2011 office visit with Zachary LaMaster, D.O. ("Dr. LaMaster"), Tremaine and Dr. LaMaster discussed her ongoing depression and worsening symptoms even with the maximum dose of Cymbalta. Dr. LaMaster added Wellbutrin to Tremaine's medication regimen ([Filing No. 22-7 at 34](#)–35).

In January 2012, Tremaine began receiving mental health treatment from therapist Melinda Kelley, M.A. ("Ms. Kelley"), and psychiatrist Leela Rau, M.D. ("Dr. Rau"), at Midtown Community Mental Health Center. *Id.* at 9. She received this treatment on at least a monthly basis. *Id.* at 6–9. Tremaine's psychosis deteriorated in May 2012, resulting in the Wishard Hospital police bringing her to the emergency room of Wishard Hospital for active suicidal ideations on May 9, 2012. She was seen by a doctor and then released the same day. *Id.* at 7, 67.

Almost two weeks later, on May 17, 2012, Tremaine was psychiatrically hospitalized at Wishard Hospital. She had told her husband that she wanted to kill herself with a knife. It was noted in her treatment record that this was her third suicide attempt. She remained hospitalized

for two days and was released on May 19, 2012. During her hospitalization, Tremaine was diagnosed with bipolar disorder and depression and was assigned a global assessment of functioning ("GAF") score of 45. Tremaine was assessed with having only limited insight and impulsive judgment. Upon discharge, she was prescribed the anti-manic drug Divalproex ER and the anti-psychotic drug Risperidone (Filing No. 22-7 at 6–7). Throughout 2012 and 2013, Tremaine continued receiving mental health treatment and counseling (sometimes multiple times a month) from Ms. Kelley and Dr. Rau at Midtown Community Mental Health Center, and she continued her anti-psychotic prescription drug regimen (Filing No. 22-12 at 3–31; Filing No. 22-7 at 6–9).

Approximately three months after her psychiatric hospitalization, Tremaine filed her SSI application in August 2012. In support of her SSI application, her therapist, Ms. Kelley wrote a letter on October 11, 2012, stating that Tremaine was being treated for bipolar disorder, and she experienced poor concentration, rapid mood swings, anger outbursts, and a history of suicidal ideations. Ms. Kelley also noted that Tremaine's symptoms interfered with her interpersonal functioning (Filing No. 22-8 at 21).

On October 26, 2012, J. Nathan Smith, M.D. ("Dr. Smith"), examined Tremaine as part of the disability application process. Dr. Smith noted Tremaine's depression and bipolar disorder and recorded that she was taking mental health medications (Filing No. 22-7 at 76–79).

On October 29, 2012, Matthew G. Grant, Psy.D. ("Dr. Grant"), performed a psychological evaluation of Tremaine for her SSI application. Tremaine talked to Dr. Grant about her manic episodes that tended to last for three months, how she heard voices when manic but not at other times, and how she slept all the time when depressed. She reported that she had about one manic episode a year and her ensuing depression lasted about six months. She also noted that she had

been psychiatrically hospitalized multiple times. She admitted to attempting to kill herself twice by carbon monoxide poisoning and overdosing on pills. She stated that her relationships were affected by her bipolar disorder and that she enjoyed nothing. Tremaine also noted that she suffered from hallucinations when experiencing a manic episode. Dr. Grant concluded his examination by diagnosing Tremaine with bipolar disorder, depression with atypical features, and a GAF score of 50. *Id.* at 80–85.

Tremaine's last contact with Ms. Kelley at Midtown Community Mental Health Center occurred on October 22, 2013. She called into the office and explained she was feeling an increase in mania because other medical professionals had discontinued her use of Cymbalta and added Remeron. Ms. Kelley told her to come into the office three days later as a walk-in appointment to meet with the psychiatrist ([Filing No. 22-12 at 30](#)). However, Robert called Ms. Kelley two days later, explaining that Tremaine would not be in the office the next day because she had collapsed and had been taken to the hospital. *Id.* at 31. Unfortunately, this hospitalization ended with Tremaine's passing on December 1, 2013, due to severe sepsis with septic shock, perforated colon with peritonitis, and pseudomembranous colitis due to clostridium difficile ([Filing No. 22-5 at 24](#)). Additional facts will be provided as needed in the discussion section below.

## II. DISABILITY AND STANDARD OF REVIEW

Under the Act, a claimant may be entitled to SSI only after she establishes that he is disabled. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous

work but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The Commissioner employs a five-step sequential analysis to determine whether a claimant is disabled. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled despite her medical condition and other factors. 20 C.F.R. § 416.920(a)(4)(i). At step two, if the claimant does not have a "severe" impairment that meets the durational requirement, she is not disabled. 20 C.F.R. § 416.920(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, and whether the impairment meets the twelve month duration requirement; if so, the claimant is deemed disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant's impairments do not meet or medically equal one of the impairments on the Listing of Impairments, then her residual functional capacity will be assessed and used for the fourth and fifth steps. Residual functional capacity ("RFC") is the "maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(1); SSR 96-8p). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(iv). At the fifth and final step, it must be determined whether the claimant can perform any other work in the relevant economy, given her RFC and considering his age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The claimant is not disabled if she can perform any other work in the relevant economy.

The combined effect of all the impairments of the claimant shall be considered throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Section 405(g) of the Act gives the district court "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Further, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). While the Court reviews the ALJ's decision deferentially, the Court cannot uphold an ALJ's decision if the decision "fails to mention highly pertinent evidence, . . . or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citations omitted).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

### III. THE ALJ'S DECISION

At step one of the sequential evaluation process, the ALJ found that Tremaine had not engaged in substantial gainful activity since August 23, 2012, the SSI application date. At step two, the ALJ found that Tremaine had the following severe impairment: bipolar disorder. At step three, the ALJ concluded that Tremaine did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ then determined that Tremaine had an RFC to perform a full range of work at all exertional levels with the following non-exertional limitations:

> [T]he claimant was limited to work involving simple and repetitive tasks requiring no independent judgment regarding basic work processes. The work goals from day to day should have been static and predictable. The claimant should have not been required to meet unusually demanding time or production quotas. She should have had only occasional, superficial contact with co-workers, supervisors, and the general public.

([Filing No. 22-2 at 25](#).)

At step four, the ALJ determined that Tremaine had no past relevant work. At step five, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Tremaine could perform such as a maid, equipment cleaner, or stock clerk. Having determined that Tremaine could perform work in other jobs in the economy, the ALJ determined that Tremaine was not disabled. Therefore, the ALJ denied Tremaine's application for SSI because she was found to be not disabled.

### IV. DISCUSSION

In her request for judicial review, Tremaine asserts two arguments for remand. First, Tremaine argues that the ALJ erred at step 3 in the sequential evaluation process when he determined that Tremaine's bipolar disorder did not meet or medically equal the "paragraph b" or

"paragraph c" factors of Listing 12.04. Second, Tremaine asserts that the ALJ's RFC determination is not supported by substantial evidence, and he ignored evidence that contradicted his decision without any explanation for why such evidence was discredited or not considered.

A. **The ALJ's Step 3 Determination**

Robert asserts that Tremaine's case should be remanded for further consideration because at step 3 the ALJ was wrong in determining that Tremaine's bipolar disorder did not meet or medically equal the "paragraph b" or "paragraph c" factors of Listing 12.04. Where a claimant shows that her impairment meets or medically equals a listed impairment, then it is determined at step 3 that she is disabled.

The "paragraph b" criteria for Listing 12.04 require that a claimant have only two of the following four factors: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decomposition, each of extended duration. Marked difficulties are greater than moderate difficulties but less than extreme difficulties. "Repeated episodes of decompensation, each of extended duration" consists of three episodes within one year, each lasting at least two weeks. *See* Listing 12.00.

The "paragraph c" criteria require a chronic affective disorder of at least two years' duration with: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would likely cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement.

Regarding the "paragraph b" criteria, Tremaine argues that the ALJ's finding of only mild restrictions to activities of daily living was based on erroneous findings not supported by the record. Tremaine points out that the ALJ found she independently attended to personal hygiene and grooming as well as helped her youngest child get ready for school in the mornings. However, Tremaine asserts, the record notes that she sometimes could not even take a shower because of her depression, and her husband had to remind her to take showers. Her medication made her sleep all day ([Filing No. 22-4 at 6](), 12). Tremaine stated she was so depressed that she would not take a shower for a week, and she often did not want to shower or put her teeth in. Robert testified at the administrative hearing that their youngest daughter got herself ready for school in the mornings, and Tremaine's sister testified that she could not function as a mother or take care of her children because she was always in bed.

The ALJ also determined that Tremaine prepared meals, washed dishes, and vacuumed. But Robert testified at the hearing that he made dinner 90% of the time, and when he was not home to prepare dinner, Tremaine sometimes would attempt to make dinner but would burn it, or she could not follow the simple directions on a box ([Filing No. 22-2 at 42]()). Robert stated in his function report about Tremaine that the "dinner meals confuse her." ([Filing No. 22-6 at 26]().) Tremaine explained in her self-assessment function report that her husband cooked and cleaned. *Id.* at 15.

The ALJ found that Tremaine shopped for groceries weekly and independently handled personal finances even though Robert testified at the hearing that Tremaine went shopping only two or three times a year, and during a psychological evaluation with Dr. Grant, Tremaine explained that her husband did the finances ([Filing No. 22-2 at 42](); [Filing No. 22-7 at 84]()). The ALJ further found that Tremaine socialized with family for recreation, but the record indicates that

10

she slept all day and could not communicate with her family, and she thought they felt like she was poison to them ([Filing No. 22-12 at 40](), 45–46).

Robert argues that these apparent contradictions between the ALJ's findings and the facts throughout the record show there is not substantial evidence that allows for a logical bridge between the evidence and the ALJ's conclusion that Tremaine had only mild difficulties with activities of daily living. He asserts the ALJ deliberately omitted the contrary evidence and failed to articulate his reasoning for discounting it, which constitutes reversible error, citing *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it; ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected).

Regarding the second "paragraph b" factor, social functioning, the ALJ determined that Tremaine had moderate difficulties. This was based on Tremaine's function report that she did not have difficulty getting along with family, friends, neighbors, and authority figures, and she never lost a job because of adverse social interactions in the workplace. However, the record shows that Tremaine lost interest in watching her kids play sports, she believed her family viewed her as poison, her family relationships were strained because of her illness, she had only one friend, and her children became bitter toward her ([Filing No. 22-6 at 84](); [Filing No. 22-7 at 80](); [Filing No. 22-12 at 40](), 45–46). The last time Tremaine worked was in 2008, well before her mental health significantly deteriorated, and her final job lasted only one day because of her paranoia ([Filing No. 22-12 at 42]()). Robert asserts the ALJ deliberately omitted the contrary evidence and failed to articulate his reasoning for discounting it. He argues that consideration of all the facts in evidence leads to the conclusion of more than moderate limitations in social functioning.

11

Concerning the third "paragraph b" factor, maintaining concentration, persistence, and pace, the ALJ determined that Tremaine had only moderate difficulties. He based this conclusion on an October 2012 mental status examination and subsequent psychological evaluations and clinical notes that recorded a stable mental status and intact attention and memory. Robert argues that the ALJ ignored evidence that Tremaine failed simple arithmetic questions and could not recall one of three words after a five minute delay during the examination. He also asserts that the ALJ erred in giving less weight to a GAF score of 50 and ignoring a score of 45 while giving more weight to higher GAF scores. Robert argues the ALJ's conclusion was not supported by substantial evidence, and he ignored contrary evidence when determining Tremaine's limitation in maintaining concentration, persistence, and pace.

Regarding the fourth factor, the ALJ found that Tremaine had experienced one to two episodes of decompensation, each of extended duration. However, the ALJ only cited the May 17, 2012 psychiatric hospitalization and neglected to mention her May 9, 2012 psychiatric hospitalization at Wishard Hospital or other prior suicide attempts, including one at age 22 ([Filing No. 22-7 at 7](), 67–69; [Filing No. 22-12 at 49]()). Robert asserts that the ALJ failed to support each of his conclusions about the "paragraph b" factors with substantial evidence, and thus, remand is appropriate for further consideration of Tremaine's listing level bipolar disorder.

Robert also argues that the ALJ erred in his analysis of the "paragraph c" factors for Listing 12.04, in that Tremaine suffered from a chronic affective disorder (bipolar) for more than two years, which the ALJ implicitly acknowledged in his decision when discussing the "paragraph c" factors ([Filing No. 22-2 at 25]()). However, the ALJ determined there were no repeated episodes of decompensation during the relevant time period, no evidence of a residual disease process that would cause decompensation from even a minimal change or increase in mental demands, and no

evidence of an inability to function outside a highly supportive living arrangement. The ALJ based these conclusions on treatment notes that stated she was alert and oriented and had no delusions or hallucinations. The ALJ also relied on his conclusion that Tremaine could independently perform activities of daily living and socialization, as discussed above.

Robert argues that the ALJ's "paragraph c" conclusions are not supported by substantial evidence because his factual findings were erroneous. He points out that Tremaine was hospitalized twice in May 2012 for suicidal ideations and then continued receiving psychological treatment almost every month until her death in December 2013. This indicated repeated episodes of decompensation. Robert asserts that the only evidence relied upon to conclude the second factor was not met is a treatment note stating Tremaine was alert and oriented and had no delusions or hallucinations. But there was evidence that Tremaine experienced delusions and hallucinations, such as hearing the sound of her eyes blinking and hearing whispers from her co-workers talking about her ([Filing No. 22-12 at 34](), 42). He argues that the evidence points to the conclusion that she did not perform activities of daily living and socialization, as discussed above, so the ALJ's opposite conclusions were not supported by substantial evidence. Therefore, Robert argues, remand is appropriate for further consideration of Tremaine's listing level bipolar disorder not only under "paragraph b" but also under "paragraph c".

The Commissioner responds to these arguments by noting that the claimant has the burden of demonstrating that her impairment satisfies "all of the various criteria specified in the listing," *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006), and the ALJ adequately explained that Tremaine failed to meet that burden. The Commissioner then points to the ALJ's decision, and the citations to the record evidence within the decision, and asserts that the decision was supported by substantial evidence as to each of the factors under Listing 12.04. The Commissioner argues

13

that the evidence cited by the ALJ supported his conclusions regarding the severity of Tremaine's various mental limitations.

The Commissioner particularly notes evidence of Tremaine's personal hygiene and grooming, helping a child get ready for school, doing dishes, vacuuming, grocery shopping, attending appointments, socializing with family, getting along fine with others, and never being fired from a job because of social problems. The Commissioner also notes evidence of Tremaine's cooperative and pleasant demeanor in clinical settings and her level of ability to concentrate and persist during mental status examinations. Treatment notes also indicated that medication management helped alleviate some of Tremaine's symptoms over time. The Commissioner argues that there is no evidence to support a finding of repeated episodes of decompensation each of extended during because this requires an episode lasting at least two weeks, and the evidence shows hospitalizations lasting only two days. Furthermore, the Commissioner points out, no medical source opined that Tremaine's bipolar disorder met or medically equaled Listing 12.04.

The Commissioner asserts that the ALJ adequately confronted the adverse evidence that undermined his decision, such as his discussion of Robert's testimony and Peggy Lybrook's testimony. The ALJ specifically explained that their testimonies were only partially reliable because of their conflicts with other subjective and objective evidence (Filing No. 22-2 at 26–27). In contrast, the Commissioner argues, Tremaine omitted from her brief the evidence supporting the ALJ's decision and instead painted a bleaker situation by including only the more severe medical evidence and subjective statements in the record. The Commissioner concludes that the ALJ's decision is adequate because he "need not address every piece of evidence in his decision." *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002); *see also Pepper v. Colvin*, 712 F.3d 351, 363

(7th Cir. 2013) ("an ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence").

The Court begins its analysis by reciting direction from the Seventh Circuit:

> We have repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it. The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.

*Moore*, 743 F.3d at 1123 (citations omitted). Additionally, the Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman*, 546 F.3d at 462. The Court notes that much of the parties' arguments border on asking the Court to reweigh the evidence, which it will not do. However, Robert also advances an important argument that the ALJ neglected to confront the evidence that undermined his conclusions and the ultimate decision. The Court addresses some of these pieces of evidence.

To support his decision that objective evidence diminished the testimony of more severe limitations, the ALJ explained that treatment notes and consultative evaluations from October 2012 through September 2013 showed an improvement in Tremaine's symptoms over time with medication management ([Filing No. 22-2 at 27](#)). The ALJ cites to various evidence scattered throughout the record, including Exhibit 17F at page 26. However, the ALJ does not mention the very next page of Exhibit 17F (from the same September 2013 office visit recorded on page 26), which records that Tremaine was sleeping all the time, had no energy, had no motivation, and had only some insight ([Filing No. 22-12 at 28](#)). The progress note also recorded that Tremaine had mood shifts, depression, irritability, and impulsive anger, and her symptoms interfered with her interpersonal functioning. *Id.* at 29.

15

The ALJ also neglected to mention or address the progress note from the next month, dated October 22, 2013. Tremaine was feeling an increase in mania because other medical professionals had discontinued her use of Cymbalta and added Remeron. Ms. Kelley told her to come into the office three days later to meet with the psychiatrist. *Id.* at 30. Robert called Ms. Kelley two days later to say that Tremaine would not be in the office the next day because she had collapsed and had been taken to the hospital. *Id.* at 31. This was the hospital visit that eventually ended with Tremaine's passing in December 2013. The ALJ failed to confront these progress notes and explain why they were rejected in reaching his decision. An ALJ is not permitted to "cherry-pick" from the mixed results in the medical records to support a denial of benefits. *Scott v. Astrue*, 647 F.3d 734, 740. It appears that this is what happened in this case.

> As stated in a Seventh Circuit opinion, and directly applicable to this case,
>
> [T]he ALJ's analysis reveals an all-too-common misunderstanding of mental illness. The very nature of bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a "good day" does not imply that the condition has been treated.

*Id.* A claimant who has bipolar disorder "has violent mood swings, the extremes of which are mania—a state of high excitement in which he loses contact with reality and exhibits bizarre behavior—and clinical depression, in which he has great difficulty sleeping or concentrating, has suicidal thoughts and may actually attempt suicide." *Bauer v. Astrue*, 532 F.3d 606, 607 (7th Cir. 2008). "[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). The ALJ "thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty

16

normally during her office visits. There was no contradiction; bipolar disorder is episodic." *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006).

When explaining that the "paragraph c" criteria for Listing 12.04 were not satisfied, the ALJ explained, "Treatment notes show that she remained alert and oriented with no evidence of delusions or hallucinations (Exhibit 1F at 31–41)." ([Filing No. 22-2 at 25](#).)  These pages from Exhibit 1F are the only evidence cited in the "paragraph c" discussion.  However, a cursory review of the record reveals that Exhibit 1F has only twenty-one pages, so there are no pages "31–41" in this exhibit.  Further review of Exhibit 1F also reveals Tremaine's history of bipolar disorder with psychotic features (*i.e.*, delusions or hallucinations) throughout 2011 and 2012 ([Filing No. 22-7 at 3](#)–6).  Thus, the very evidence cited by the ALJ does not exist in the record, and the evidence closest to the ALJ's citation actually supports the opposite conclusion—that Tremaine did have delusions or hallucinations.

The record includes evidence that Tremaine experienced delusions or hallucinations—Tremaine's journal entries of hearing the sound of her eyes blinking and hearing whispers from her co-workers talking about her ([Filing No. 22-12 at 34](#), 42).  The ALJ discussed the evidence that was in close proximity to this evidence within the record.  Yet, the ALJ failed to acknowledge, mention, or discuss this evidence at all.  Instead, the ALJ stated there was no evidence of delusions or hallucinations.  Again, the ALJ is not permitted to "cherry-pick" the evidence to support his decision to deny benefits.  *Scott*, 647 F.3d at 740.

Because the Court has determined that the ALJ did not confront the evidence that conflicted with his step 3 conclusions and failed to explain why that evidence was rejected, the Court concludes that remand is appropriate for further consideration by the ALJ.

**B.      The ALJ's RFC Determination**

Robert makes a similar argument regarding the ALJ's RFC determination. He asserts that the RFC determination is not supported by substantial evidence, and the ALJ ignored evidence that contradicted his decision without any explanation for why such evidence was discredited or not considered. He asserts that the RFC does not adequately account for Tremaine's mental limitations and bases this assertion on the same facts and evidence discussed in the section above regarding the step 3 analysis. He points to evidence about her personal hygiene, cooking and cleaning limitations, childcare limitations, and sleeping habits. He also points to hearing testimony about Tremaine's limitations. The Commissioner responds by relying on the same arguments presented above as well as asserting that "the ALJ was only required to incorporate limitations that [he] found supported by the evidence." *Alvarado v. Colvin*, 836 F.3d 744, 751 (7th Cir. 2016). The Commissioner argues that no medical professional opined that greater limitations were warranted. For the reasons described above regarding the ALJ's need to confront the evidence that contradicts his conclusions, the Court determines that remand is appropriate for the ALJ to consider the evidence that supports possibly greater restrictions to Tremaine's mental capacity to perform work.

Robert also argues that the ALJ erred by using the language "simple repetitive tasks" to account for her mental limitations in the RFC. He argues that the Seventh Circuit has rejected the view that "confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Taylor v. Colvin*, 829 F.3d 799, 802 (7th Cir. 2016). The Commissioner responds that "plaintiff is reading the Seventh Circuit's decisions too narrowly" and that the court has held, in most cases, "employing terms like 'simple, repetitive tasks' on their own will not necessarily"

account for an individual's moderate limitations in concentration, persistence, or pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). The Commissioner points out that the ALJ did not use the term "simple repetitive tasks" alone to account for Tremaine's mental limitations. Instead, the ALJ provided additional detailed limitations in the RFC to account for Tremaine's limited mental capacity. The Court concludes that the ALJ provided sufficiently detailed limitations in addition to the "simple and repetitive tasks" limitation, and thus, this argument is unavailing for Tremaine.

Finally, Robert asserts the ALJ erred in finding no physical functional limitations when considering Tremaine's RFC. He points to evidence in the record of her ongoing insomnia and daytime fatigue and her diagnoses of pelvic muscle dysfunction, extensive diffuse hepatocelluar disease, scoliosis, and arthritis of the back. In response, the Commissioner contends that the ALJ's physical RFC finding was supported by multiple physicians' opinions that there were no severe physical limitations and no significant physical exam findings. There were no medical opinions contradicting this evidence. The Commissioner asserts that Tremaine failed to explain how her diagnoses of physical conditions caused any work-related functional limitations. A diagnosis of a disorder does not demonstrate the severity of an individual's symptoms. *Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007) ("existence of these diagnoses and symptoms does not mean the ALJ was required to find that [claimant] suffered from disabling impairments"). The Court agrees that Tremaine failed to show how her physical conditions caused any work-related functional limitations requiring physical accommodations in the RFC. The ALJ pointed to evidence in the record to support his physical RFC determination. Thus, the Court determines that this argument also is unavailing for Tremaine's claim.

## V. CONCLUSION

For the reasons set forth above, the final decision of the Commissioner is **REMANDED** for further limited proceedings, consistent with this Entry as authorized by Sentence Four of 42 U.S.C. § 405(g).

**SO ORDERED.**

Date: 3/30/2018

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Irving Marshall Pinkus
PINKUS & PINKUS
impinkus@pinkusattorneys.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov